IN THE UNITED STATES DISTRICT COURT FOR THE
                  EASTERN DISTRICT OF OKLAHOMA

JANET KELTON,                    )
                                 )
          Plaintiff,             )
                                 )
v.                               )    Case No. CIV-06-236-KEW
                                 )
JO ANNE B. BARNHART,             )
Commissioner of Social           )
Security Administration,         )
                                 )
          Defendant.             )

                         **OPINION AND ORDER**

    Plaintiff Janet R. Kelton, (the "Claimant") requests judicial review of the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying Claimant's application for disability benefits under the Social Security Act. Claimant appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Claimant was not disabled. For the reasons discussed below, it is the finding of this Court that the Commissioner's decision should be and is REVERSED AND REMANDED for further proceedings.

                **Social Security Law and Standard of Review**

    Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . ." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ." 42 U.S.C. §423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. *See*, 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. Hawkins v. Chater, 113 F.3d 1162, 1164 (10th Cir. 1997)(citation omitted). The term "substantial

---

[1] Step one requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. 20 C.F.R. §§ 404.1521, 416.921. If the claimant is engaged in substantial gainful activity (step one) or if the claimant's impairment is not medically severe (step two), disability benefits are denied. At step three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to step four, where claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's step four burden is met, the burden shifts to the Commissioner to establish at step five that work exists in significant numbers in the national economy which the claimant – taking into account his age, education, work experience, and RFC – can perform. Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. *See generally,* Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988).

2

evidence" has been interpreted by the United States Supreme Court to require "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court may not re-weigh the evidence nor substitute its discretion for that of the agency. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the court must review the record as a whole, and the "substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); *see also*, Casias, 933 F.2d at 800-01.

### Claimant's Background

Claimant was born on July 18, 1959 and was 46 years old at the time of the hearing before the ALJ. She completed her education through the 12th grade. Claimant has worked in the past as an administrative assistant. She alleges an inability to work beginning January 1, 2003, due to neck and back pain.

### Procedural History

On November 17, 2003, Claimant filed for disability benefits under Title II of the Social Security Act (42 U.S.C. § 401, et seq.) Claimant's application for benefits was denied initially and upon reconsideration. A hearing before ALJ, Lantz McClain was held

on August 2, 2005, in McAlester, Oklahoma. By decision dated March 8, 2006, the ALJ found that Claimant was not disabled at any time through the date of the decision. On May 12, 2006, the Appeals Council denied review of the ALJ's findings. Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Decision of the Administrative Law Judge

The ALJ made his decision at step four of the sequential evaluation. He determined that while Claimant's medical conditions were severe, they did not meet a Listing and she retained the residual functional capacity ("RFC") to perform a full range of light work, including her past relevant work.

## Review

Claimant asserts the ALJ committed error requiring reversal in failing to (1) give appropriate weight to Claimant's treating physician's opinion; and (2) support his findings that Claimant's impairments did not meet the requirements of a Listing.

## Treating Physician's Opinion

Claimant asserts the ALJ failed to attribute the appropriate weight to the opinion of Dr. Gregory Rogers, one of her treating physicians. The ALJ specifically considered the Medical Assessment of Ability to Do Work Related Activities (Physical) form completed by Dr. Rogers on August 15, 2005. The ALJ concluded the opinion reflected in the Medical Assessment was "[a] conclusory statement

4

based solely on claimant's relation of symptoms and is not supported by any significant objective medical findings, and therefore, his opinion has been given minimal weight." (Tr. 16)

Dr. Rogers is undoubtedly a "treating physician" for Claimant. Medical records from Dr. Rogers cover the period from July 31, 2002 through February 3, 2005. During this period, Claimant was treated on numerous occasions for multiple complaints, including back and neck pain.(Tr. 217-245) On December 23, 2002, a cervical MRI was performed pursuant to Dr. Rogers' request. The MRI showed a

> marked narrowing of the disc space at C5-C6, which may be related to [a] previous surgery and fusion. There are disc bulges at C3-C4, C4-C5 and an osteophyte at C6-C7. At C3-C4, there is some mild narrowing centrally with a small central subligamentous herniation. At C4-C5, the disc is broad based with some narrowing of the neural formina on the left. This may be due to a combination of bony encroachment as well as protruding disc. C5-C6 shows no definite encroachment. At C6-C7, there is some bony overgrowth with narrowing of the neural formina bilaterally.

(Tr. 228)

Dr. Kathy Wyant found "[p]ostsurgical changes with multiple levels of bulging discs. The most significant level seems to be C4-C5 with a broad based osteophyte and fairly marked narrowing of the

5

left neural foramina." Id.

On August 15, 2005, Dr. Rogers completed the Medical Assessment form. He assessed Claimant as being capable of sitting less than six hours in a workday, standing and walking less than two hours in a workday, and capable of lifting only under 10 lbs. Dr. Rogers stated on the form that Claimant was limited in the ability to push and/or pull in the upper and lower extremities. He noted that lifting, carrying, pushing, or pulling greatly increased Claimant's pain in the neck and lower back  Pushing with the legs was found to result in an immediate flare-up in the lower back. Dr. Rogers found Claimant had postural limitations which would preclude climbing, balancing, and crawling. She was able to only occasionally kneel or crouch. Manipulative limitations were found in Claimant's ability to reach all directions (including overhead), handle (gross manipulation), finger (fine manipulation), and feel (skin receptors). Environmental limitations included the inability to work in temperature extremes, vibration, humidity/wetness, hazards (machinery, heights,...) or be exposed to fumes, odors, chemical, gases. Dr. Rogers opined that

> [t]emperature extremes affect muscle and nerve functions, which are greatly limited already. Vibrations also affect nerve and muscle functions. Humidity makes surfaces slick and pt. would be prone to falls because of proprioceptive and nerve/muscle dysfunctions. A

hazardous environment would be increasingly dangerous due to patient's poor motor (balance control). The patient suffers from significant allergies and would be prone to respiratory disorders.

(Tr. 247-249)

To support his conclusions, Dr. Rogers listed the lumbar MRI performed on May 28, 2004, which showed chronic degenerative changes at L4-5 disc herniation and right sided root entrapment. Dr. Rogers noted the confirmation by Dr. Christopher Covington of multi-level degenerative disc disease of the cervical spine, and radicular pain after surgery to the lumbar area. He listed abnormal nerve conduction studies, including C6 radiculopathy, as noted by James M. Roscue, D.O. Dr. Rogers also listed a review of the physical therapy notes in conjunction with a 9-1-04 office visit confirming lack of significant progress and confirmation by neurosurgeon, Dr. Christopher Covington of a degenerative neck discs and C3-4 disc protrusion as well as his repeated physical examinations since 12-6-02.

(Tr. 248)

Claimant also treated with Dr. Christopher Covington from August 4, 2003 through September 9, 2003 with complaints of neck and low back pain with radiation into the right leg. On July 11, 2003, Dr. Covington noted Claimant had a C5-6 anterior cervical discectomy and fusion in 1993, with recurrent pain for about a

7

year.(Tr. 202) Pursuant to Dr. Covington's request, MRI testing was performed on the cervical and lumbar spine of August 4, 2003. The MRI scan of the cervical spine revealed:

> C2-3: normal. C3-4: a small central disk protrusion is seen in the midline to contact the spinal cord and attenuate the subarachnoid space to approximately 11m. No deformation of the cord is apparent and foraminal encroachment or facet antropathy is associated. C4-5: the disk bulges are mildly and diffusely posteriorly, associated with disk space height loss and minimal posteriorly projecting osteophytes. The disk/spur complex attenuates the subarachnoid space to slightly less the 10.0 mm and contact the ventral surface of the cord without flattening it. Mild extension of the disk/spur into the exit foramina result in mild foraminal stenosis. C5-6: bone marrow signal bridges the interspace with no evidence of recurrent/residual disk herniation. A small spur originates from the superior margin of the C6 vertebral body and this contacts the cord just to the left of midline without flattening it. The exit foramina are unimpinged. C6-7: disk space height is associated with mild endplate irregularity and anteriorly and posteriorly projecting endplate spurs. The disk bulges in association with the spurs, but does

8

not extend beyond them by more than a millimeter or two. The disk/spur complex attenuates the subarachnoid space to approximately 10.0 mm in the midline and slightly to a greater extent just to the left. Associated left forminal stenosis is mild. C7-T1: normal, the facet joints are normal at all levels. Impression: multi-level spondylosis, as described above.

(Tr. 151-152)

The MRI scan of the lumbar spine found:

> the conus medullaris is unremarkable in its appearance at L1-2. L1-2: disk space height is slightly reduced along with desiccation and small Schmorl's nodes. No significant posterior spur or disk protrusion is evident. L2-3: normal. L3-4: normal. L4-5: slight disk space height loss is associated with disiccation and endplate irregularity along with fatty marrow changes, particularly to the right. The disk bulges posteriorly diffusely among with mild posterolaterally projecting endplate spurs. The disk extends beyond the spurs by 2.0 to 3.0 mm in the midline, where T2 hyperintensity indicates the presence of associated peripheral annular tears. Axial images indicate that the bulging disk is slightly more prominent on the right, where it extends into the exit foramen slightly. Fat continues to

surround the exiting nerve root there, so the neurologic significance is uncertain. The central spinal canal is tapered to approximately 9.0 mm in the midline and is slightly narrower on the right due to a combination of the rightward prominence of the disk bulge and slight overgrowth of a right L4-5 facet complex anteromedially along with ligamentum flavum hypertrophy. L5-S1: Disk space height loss and dessication are associated with a mild disk bulge, which extends 2.0 to 3.0 mm beyond the confines of related endplates posteriorly and extends into the proximal exit foramina bilaterally. Only a small amount of fat is seen within the exit foramen on the left and foraminal stenossi is moderately severe on the overgrowth and ligamentum flavum hypertrophy result in lateral recess stenossis and may contribute to right-sided radiculopathy; Impression, multi-level degenerative changes, as described above.
(Tr. 152-153)

On September 8, 2003, Dr. Covington performed a microdiscectomy/laminectomy at L4-5 and L5-S1. (Tr. 195-196) Claimant continued to complain of pain in her right low back with pain wrapping around to her groin. She also complained of pain in her right knee. However, her anterior thigh pain had resolved. (Tr. 192) Claimant continued to have recurring right L5 discomfort

10

on December 16, 2003. Multi-level degenerative disc disease of the cervical spine was also discussed. (Tr. 186) Diagnostic studies revealed a

> Normal MRI of the pelvis and hips. There is slight asymmetry in the fat identified within the right S1 joint as compared with the left and it is uncertain whether this could represent some inflammatory change within the right S1 joint. Heavily T-2 weighted sequence does not indicate significant asymmetry in the amount of fluid nor within the two S1 joints of the signal change on T1 is of questionable significance. CT may be of further assistance is clinically indicated.
>
> (Tr. 180-181)

The MRI scan of the lumbar spine showed

> [t]he lumbar vertebral bodies are normal in alignment without evidence of compression deformities. There is abnormal signal along the inferior endplate of L4 and to a lesser extent superior endplate of L5. There is degenerative disc at L4-5 level with a small disc herniation identified within the midline and slightly to the right of midline. There is degenerative disc disease at the L5-S1 level with loss of disc space water. Impression: There is chronic degenerative disc disease at L4-5 level with disc herniation centered within the

11

midline and extends to the right of midline with rootlet entrapment. No significant abnormal gadolinium enhancement is identified.

(Tr. 181)

In deciding how much weight to give the opinion of a treating physician, an ALJ must first determine whether the opinion is entitled to "controlling weight." Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). An ALJ is required to give the opinion of a treating physician controlling weight if it is both: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) "consistent with other substantial evidence in the record." Id. (quotation omitted). "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

Even if a treating physician's opinion is not entitled to controlling weight, the "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527." Id. (quotation omitted). The factors referenced in that section are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4)

12

consistency between the opinion and the record as a whole; (5) whether or not he physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Id at 1300-1301. (quotation omitted). After considering these factors, the ALJ must "give good reasons" for the weight he ultimately assigns the opinion. 20 C.F.R. § 404.1527 (d)(2); Robinson v. Barnhart, 366 F.3d 1078, 1082 (10th Cir. 2004) (citations omitted). Any such findings must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." Id. "Finally, if the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d 1301 (quotations omitted).

Despite the ALJ's determination that he gave "little" weight to the opinion from Dr. Rogers, there is no indication that his opinion was given any weight. The evidence from the record generally supports the problems of which Claimant complained when attended by Dr. Rogers as well as the restrictions contained within the Medical Assessment form. Visits to other medical facilities and physicians reflect the same complaints, level of pain and restricted mobility. The rejection of Dr. Rogers opinion without engaging in the analysis required by the Social Security regulations and controlling precedent is unacceptable. The ALJ

13

must progress through the "controlling weight/deferential weight" analysis and explain with a certain degree of specificity as to the reasons for rejecting the proffered opinion. The ALJ failed to do so in this case, requiring reversal.

### Step Three Findings

Claimant next contends the ALJ's findings that she did not meet the criteria of any of the listed impairments is not based on substantial evidence. Since the ALJ's conclusions at step three of the sequential analysis were formed without any apparent consideration of Dr. Rogers opinions, the decision must be reversed. On remand, the ALJ shall reconsider his conclusions regarding the criteria of any listed impairments after engaging in the required analysis of Dr. Rogers assessments.

### Conclusion

The decision of the Commissioner is not supported by substantial evidence and the correct legal standards were not applied. Therefore, this Court finds the ruling of the Commissioner of Social Security Administration should be and is **REVERSED and the matter REMANDED** for further proceedings consistent with this Order.

Dated this 25th day of April, 2007.

Kimberly E. West
United States Magistrate Judge
Eastern District of Oklahoma